# SCOTT & SCOTT

ATTORNEYS AT LAW
109 E. Main Street
Elkton, Maryland 21921

Doris P. Scott
Charles L. Scott, Jr.
———
Jennifer M. Chesney
———
Charles L. Scott 1920-2014

(410) 398-0611
Facsimile: (410) 398-0617
dscott@scottandscott.com
cscottjr@scottandscott.com
jennifer@scottandscott.com

David S. Scott
Of Counsel
dss@scottandscott.com

May 13, 2016

Via Certified Mail, Return Receipt No. 7014 2870 0000 7063 8865

Ms. Nancy K. Kopp, State Treasurer
Office of the State Treasurer
Louis L. Goldstein Treasury Building
80 Calvert Street, Room 109
Annapolis, Maryland 21401

Attn: Ms. Nancy K. Kopp, Treasurer

RE:     Notice of Claim Form

Dear Ms. Kopp:

Please be advised that our firm represents Ms. Lisa E. Garvine regarding personal injuries she sustained as a result of a serious horseback riding fall caused by a hidden six (6) foot abutment that occurred at Fair Hill Natural Resources Management Area on Sunday, October 11, 2015. Please allow this to serve as our written notice of claims pursuant to Md. Code Ann., State Gov't, §12-107.

The facts are as follows:

1. Claimant:

Lisa E. Garvine
23 Jericho Road
Salem, New Jersey 08079
Cell: (856) 296-2089

2. Counsel for Claimant:

Charles L. Scott, Jr., Esq.
Scott & Scott, Attorneys at Law
109 E. Main Street
Elkton, Maryland 21921
Phone: (410) 398-0611

1

**EXHIBIT #1**

FILE COPY

Fax: (410) 398-0617

3.  Date & Time of Loss:       Sunday, October 11, 2015 at approximately 10:30am-
                               11:00am

4.  Location of Loss:          Fair Hill Natural Resources Management Area

5.  County:                    Cecil County

6.  State Agency Involved:     Department of Natural Resources

7.  Amt. of Damages Claimed:   $127,675.16

8.  Description of Incident:

    Ms. Garvine suffered serious injuries as the result of a horseback riding fall caused by a hidden six (6) foot abutment that occurred on Sunday, October 11, 2015 at an event that took place at Fair Hill Natural Resources Management Area in Elkton, Maryland.

    Ms. Garvine is a fifty-six (56) year old resident of Salem County, New Jersey where she lives with her fiancée, Kenton A. Haaf. Ms. Garvine works in upper management for Windcrest Animal Hospital in Wilmington, Delaware. She and Mr. Haaf also own and operate White Horse Treasures, a quality resale shop in Salem, New Jersey.

### The Accident

    Ms. Lisa E. Garvine, an avid equestrian with over forty (40) years of experience, registered to participate in Oxford Feed & Lumber's 6th Annual 2015 Pink Poker Prance, a horseback riding fundraiser for breast cancer.[1] The trail ride was scheduled to begin between 8am and noon on Sunday, October 11, 2015, with the ride departing from the trailer parking lot on Rt. 273 in Fair Hill, Maryland. Almost three hundred fifty (350) equestrians participated in the popular event.

    Ms. Garvine was riding her creamella quarter horse named Ice, whom she had been riding for seven (7) years. After getting her horse ready, Ms. Garvine prepared to begin the ride with her friend, Sandy Boyer, and Ms. Garvine's fiancée's daughter, Lee Ann Haaf. From the trailer parking lot, Ms. Garvine, Ms. Boyer, and Ms. Haaf made their way (on horseback) across the field via a dirt trail. At the end of the trail there was a break in the fence that allowed the riders to enter onto a dirt road (where the trail was set to begin).

    After passing through the break in the fence and making it to the dirt road, Ms. Garvine, Ms. Boyer, and Ms. Haaf had to sit in place on their horses waiting for riders ahead of them to proceed (essentially there was a bottleneck of riders who crossed the field and then had to merge onto the trail). While waiting for the congestion to disperse, more and more riders kept lining up

---

[1] See event flyer attached hereto as Exhibit #1.

2

behind Ms. Garvine and her friends to begin the ride. As the trail organizer, Oxford Feed & Lumber allowed the bottleneck to occur resulting in many horses being in close quarters.

While waiting for their chance to enter the trail, Ms. Garvine turned Ice around (so that she was facing the opposite direction of the trail and towards the field they had just come from) in order to speak with Ms. Boyer. After a few minutes, Ms. Garvine began to turn Ice back around to see whether the trail was clearing ahead when Ice stepped back, and without warning, his right rear hoof stepped off a hidden abutment that Ms. Garvine had not known existed. All Ms. Garvine could do was yell "Sandy, he's going down" and grab onto Ice's neck. Suddenly, Ms. Garvine and Ice were tumbling backwards down a nearly six (6) foot drop-off into where a culvert pipe drained. After falling close to twelve (12) feet (since she was atop of Ice, a 15.1 hand horse), Ms. Garvine lay on a bed of rocks, with Ice on top of her, under approximately two (2) feet of water.[2]

Ms. Garvine, trapped under her twelve hundred pound (1200 lb.) horse, immediately began to panic and attempted to scream, but this only caused her to inhale water. In those seconds, there was no doubt in Ms. Garvine's mind that she was going to drown. Ice, who was understandably also panicking, thrashed from side to side four (4) or five (5) times (still on top of Ms. Garvine) in an effort to gain enough momentum to get up. Finally, Ice was able to right himself and Ms. Garvine was subsequently able to stand in the water, albeit in a daze.

Through tall (18" high) grass, twigs, sticker bushes, and branches, Ms. Boyer (who had jumped off of her horse and was atop of the culvert) saw Ms. Garvine standing with her clothes saturated and her hair strewn across her face and dripping wet. Ms. Boyer frantically searched for a less steep area where she was able to climb down in order to run to Ms. Garvine's aid.

Ms. Garvine, still in a daze, began to panic all over again when she noticed the red blood-stained water, and then saw Ice standing several feet behind her with blood gushing from his hind leg.

Ms. Boyer became even more worried as she descended to the water, realizing just how far her friend had fallen, backwards nonetheless. While Ms. Boyer helped Ms. Garvine walk back up the hill (without touching her right arm which Ms. Garvine had hastily said was in a lot of pain), she noticed additional injuries to Ms. Garvine's face, shoulder, and arm. Upon re-entering the trail, Ms. Boyer was shocked and appalled to realize that there truly had been no warning of the sudden drop-off hidden behind the unmowed grass and vegetation.[3]

Several people immediately took action by offering assistance. One staff member brought a "4-wheeler" type of vehicle, loaded Ms. Garvine on to it, and drove her to the upper parking lot where the first aid tent was located so she could be examined and treated.

As Ms. Garvine was carted away, Ms. Boyer stayed behind to help get Ice out of the creek. Once Ice was brought back to the trail, it was immediately apparent that his right rear leg was bleeding profusely because from his knee down was totally saturated in blood. One of the

---

[2] See pictures of culvert attached hereto as Exhibit #2.
[3] See Sandy Boyer's Affidavit attached hereto as Exhibit #3.

event organizers, named Lindsey, rushed to Ice's side to offer assistance. With every heartbeat, blood was squirting out of Ice's leg. Lindsey may have saved Ice's life by quickly thinking to stick her finger in the gaping hole in Ice's leg to stop (or at least slow) the bleeding.[4]

Someone, unbeknownst to Ms. Garvine, called 9-1-1, and as a result, Singerly Fire Co. dispatched an ambulance at 10:56am. A nurse who was just about to start the ride saw Ms. Garvine on the 4-wheeler and rushed to her side. Ms. Garvine was experiencing back and shoulder pain, and was unable to move her right arm in order to get her shirt off so her shoulder could be examined, forcing the nurse to cut it off. The nurse checked for signs of a concussion, but thankfully found Ms. Garvine to be alert and oriented.

Upon arrival at 11:08am, Singerly Fire Co. paramedics found Ms. Garvine sitting, conscious and alert, in a "gator" (4-wheeler type vehicle) in the parking lot. Ms. Garvine related to the paramedics that her right shoulder and back were hurting. Paramedics observed bruising to her back and an abrasion on her right elbow. Ms. Garvine's vitals were taken as she explained that her horse had stepped off a hidden ledge, causing it to fall off the embankment and land on top of her.

Ms. Garvine was able to stand up in order to sit down on the stretcher. It was determined that the least painful position was for Ms. Garvine to rest her arm on her leg, so she was not placed in a swing or swathe. After learning that Christiana Hospital was diverting trauma patients at that time, Singerly Fire Co. decided to transport Ms. Garvine (via ambulance) to Union Hospital in Elkton, Maryland. See copy of Singerly Fire Co.'s records attached hereto as Exhibit #5.

Ice was examined by a veterinarian who was on site for the event. The veterinarian had to inject Ice with sedatives in order to examine, and subsequently bandage, his leg. After being loaded into an ambulance, but before leaving for the hospital, Ms. Garvine asked Ms. Boyer to call her (regular and trusted) veterinarian so he could examine Ice once Ms. Boyer and Ms. Haaf drove him back to New Jersey.

In accordance with her friend's request, Ms. Boyer called Robert Stephens, V.M.D. and requested an emergency visit upon their return home (about a 1 hour drive). Ms. Haaf called her father, who immediately drove to the event, obtained directions to Union Hospital, and then rushed there to see his fiancée.

Ms. Boyer and Ms. Haaf, with help from a few other individuals, were able to load Ice into Ms. Garvine's trailer. During the drive back to New Jersey, Ms. Boyer, who was upset and shaking, became further troubled by the nagging thought that the whole incident could have been avoided if only a railing, guardrail, or fence had been installed, or at the very least, a caution sign had been posted warning of the danger.

---

[4] In hindsight, it appears that Ice cut his leg on a metal pole that was sticking out of the side of the embankment and appeared to be part of an old fence. See picture labeled as Exhibit #4 attached hereto.

4

Upon arrival back at Ms. Garvine's home, Dr. Stephens examined Ice and took multiple x-rays.  Physical examination and the x-rays revealed that Ice had sustained a bone chip and had lacerated an artery (neither of which, luckily, proved to be life-threatening).

### Liability

Negligence has been defined as "any conduct, except conduct recklessly disregardful of an interest of others, which falls below the standard established by law for the protection of others against unreasonable risk of harm."[5]  More simply stated, negligence is the absence of care according to the circumstances.

There are four (4) elements to a negligence claim, including: a duty owed, a breach of that duty, proximate cause, and an actual loss or injury.

Duty

In a negligence claim, "duty" means an "obligation to conform to a particular standard of conduct toward another."[6]  Said duty is dependent upon the relationship between the two parties.

In Maryland, the duty a property owner owes to a visitor depends on the visitor's legal status for being on the property.  Maryland recognizes the following categories of persons who enter another's property: invitee, licensee, and trespasser.

The highest duty is owed to a business invitee, whom can be defined as "one invited or permitted to enter another's property for purposes related to the landowner's business."[7]  A business invitor owes business invitees the following duties: to warn of known hidden dangers, a duty to inspect, and a duty to take reasonable precautions against foreseeable dangers.[8]

A property owner owes an invitee a duty to use reasonable and ordinary care to keep the premises safe (specifically the portions of the property that the invitee may be expected to use[9]), and is liable for injuries sustained as a result of his failure to do so.[10]  A property owner also has a duty to protect invitees from injuries caused by unreasonable risks that the invitee, while exercising ordinary care for his or her own safety, would not discover.[11] An invitee is entitled to expect that the land owner exercised reasonable care in preparing the land for safe entry and use for the purposes of the invitation.[12][13]

---

[5] Restatement of Torts A.L.I. sec. 282.
[6] *Veytsman, et al. v. New York Palace, Inc.*, 170 Md.App. 104, 906 A.2d 1028 (2006).
[7] *Tennant v. Shoppers Food Warehouse Md. Corp.*, 115 Md.App. 381, 693 A.2d 370 (1997).
[8] *Id.* at 388, 374.
[9] *University of Maryland Eastern Shore v. Rhaney*, 159 Md.App.44, 53, 858 A.2d 497, 502 (2004).
[10] *Maans v. Giant of Maryland, L.L.C.*, 161 Md.App. 620, 871 A.2d 627 (2005).
[11] *Rhaney* at 56.
[12] *Id.*
[13] Due, ordinary, or reasonable care is determined on a case-by-case basis depending on the facts and circumstances of that specific case.

Where an owner's (or other person in charge of property's) failure to exercise due care creates risks of personal injury, the principal determinant of duty becomes foreseeability.[14] "Foreseeability" means that a person of ordinary intelligence should have anticipated the dangers that the negligence created.

Ms. Garvine was participating in an event that was held on Fair Hill Natural Resources Management Area property, and Fair Hill NRMA charges a fee for events held on its property. Therefore, Ms. Garvine was a business invitee, and the State of Maryland, more specifically, the Department of Natural Resources, had a duty to use reasonable and ordinary to keep individuals participating in the event safe. (At the least, Ms. Garvine was a public invitee because she was on the State of Maryland's property for a purpose for which the land is help open to the public-horseback riding.)

The Fair Hill NRMA Trail Marking Policy requires that the event organizers submit a map of the trails to be used, along with an example of the markers to be used, and a security deposit in the amount of $300. The Policy further explains that the deposits will be turned upon course inspection. Therefore, Fair Hill NRMA has an affirmative duty to inspect a course that has been designated by the event host/organizers.

<u>Breach</u>

The State of Maryland, particularly Fair Hill NRMA, had an undeniable duty to inspect and ensure that the property was safe for its invitees.[15]

The State of Maryland, particularly Fair Hill NRMA breached its duty by failing to adequately inspect and/or take reasonable precautions to make the trail safe, or at minimum, to warn of the danger.

Specifically, Fair Hill NRMA was aware (or should have been) that the area where Ms. Garvine was injured was a potential danger to participants because it was the designated start of the trail ride, involved a *man-made* culvert, and was not readily visible.

Fair Hill NRMA should have inspected the trail and starting area to determine that it was safe for its participants. A proper inspection would have revealed the hidden defect.

It should have been foreseeable upon inspection or a pre-event trail ride that participants would be unaware of a hidden six foot immediate drop right off of the trail, and as such, Fair Hill NRMA had a duty to warn the participants of the hidden danger, and/or have the owner to take necessary precautions to prevent injury (i.e. cut the grass and overgrown shrubs, install a guard rail or fence). The participants had every reason to believe that Fair Hill NRMA had exercised reasonable care in preparing and approving the event and making sure it was safe for the participants.

---

[14] *Blondell v. Littlepage*, 413 Md. 96, 991 A.2d 80 (2010).
[15] According to the Facilities Agreement [specifically the Trail Marking Policy (see exhibit #17)] it was Oxford Feed and Lumber's responsibility to designate the trail, to provide a map of the designated trail to Fair Hill NRMA, and to adequate mark said trail.

Fair Hill NRMA should have known that a large number of horses and riders (approximately 350 participants) would cause a bottleneck due to the narrow point of entry onto the trail, and that some riders may be forced a few feet off of the trail to make room for other riders.[16]

In the immediate aftermath of Ms. Garvine's terrifying twelve (12) foot plunge backward, orange traffic cones and caution tape were placed at the edge of the trail where the hidden drop-off was in order to serve as a warning to other participants to prevent them from also being injured.[17]

On or about October 14, 2015, Ms. Garvine and her fiancée (upon the request of her attorney) returned to the scene of the accident to take pictures. Ms. Garvine immediately realized that the 18" high grass had been mowed, that the overgrown bushes, branches, and twigs had been cleared, and that caution tape had been hung. With the area newly cleared and largely cut back (obviously feasible precautionary measures), Ms. Garvine could see the steep drop that caused her traumatic fall and injuries and it caused her to shudder at the memory.[18]

<u>Proximate Cause</u>

It is a basic principle that "negligence is not actionable unless it is a proximate cause of the harm alleged."[19] Proximate cause is "that which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces the injury, and without which the result would not have occurred."[20]

"Negligence and reasonable care derive their significance from a factual background, in which there must be evidence of circumstances which support a legitimate inference that in the exercise of reasonable care injury could have been avoided." [21]

Simply stated, had Fair Hill NRMA not breached its duties as a business invitor, Ms. Garvine, an avid equestrian with more than forty (40) years of experience, would not have been injured.

The failure to inspect and maintain the trails (and surrounding area), and the failure to properly warn of and guard against the hidden, man-made six (6) foot drop-off proximately caused Ms. Garvine's fall and her injuries. In other words, had the area been cleared, a fence or

---

[16] See picture showing the close proximity of the drop-off to the trail attached hereto as Exhibit #7.

[17] See picture attached hereto as Exhibit #8.

[18] While subsequent remedial measures cannot be used to prove negligence, they may be used to prove that remedial measures were possible. See pictures attached showing the embankment after the grass had been mowed, cut back, and branches trimmed, and also pictures showing the grass clippings in the water where the culvert empties below the steep embankment) hereto as Exhibit #9.

[19] *Pittway Corporation, et al. v. Collins, et al.*, 409 Md. 218, 243, 973 A.2d 771, 786 (2009) [quoting *Stone v. Chicago Title Ins.,* 330 Md. 329, 337, 624 A.2d 496 (1993).

[20] Black's Law Dictionary.

[21] Baltimore Transit Co. v. Prinz, 215 Md. 398, 403, 137 A.2d 700, 702-03 (1958).

guardrail been installed, or had the area been sufficiently posted/marked, Ms. Garvine would have known that the danger existed and she would have been able to avoid it.

Ms. Garvine, who was sharing a small area at the start of the trail with a large number of horses and riders, had no reason to believe that such a danger existed right off of the trail at the designated start of the ride.

Accordingly, as liability is presumably not in dispute, I will turn my attention to the issue of damages.

### Ms. Garvine's (Actual) Injuries

Ms. Garvine arrived at the emergency room at Union Hospital at approximately 11:40am. Upon arrival, Ms. Garvine presented with complaints of right shoulder pain, and abrasions to her back and right upper extremity were observed.[22]  She advised that she had been horseback riding when she and her horse fell backwards off a hidden embankment and she was pinned underneath the horse, who then thrashed back and forth (on top of her) in an attempt to stand up.

Ms. Garvine was initially given Toradol 30mg for severe pain, but when that proved futile, morphine 4mg was administered intravenously (and then Morphine 2mg approximately 3 ½ hours later).

Physical examination revealed that Ms. Garvine was experiencing pain on the bony prominence of T8 (upper part of thoracic spine), and that she had a large abrasion and "road rash" extending all the way from her left scapula to her right (scapula) from C7 to T9.

Ms. Garvine presented with limited abduction of her right upper extremity as a result of pain with deformity and ecchymosis at the humeral head.  It was noted that her right upper extremity pain worsened with range of motion, and that nothing seemed to improve the pain. **Ms. Garvine rated the severity of her pain as "greater than 10" on a scale of 1-10.**

X-rays of Ms. Garvine's right radius and shoulder, and T-spine were performed.  While the results of the T-spine came back normal, the shoulder x-ray revealed findings that were concerning for a scapular fracture, thought to be a possible posterior dislocation.  As a result, a CT scan of Ms. Garvine's right scapula was ordered.

Mr. Garvine's shoulder CT scan confirmed that she had **sustained a comminuted displaced fracture of the body of the right scapula** involving the infraspinatus portion of the right scapula, with a surrounding large hematoma.

Silvadene cream was applied to Ms. Garvine's wounds and her right upper extremity was placed in a sling.  She was discharged at 5:42pm having been provided with a sling and swathe, and having been prescribed Oxycodone, Ibuprofen 600mg, and Diazepam to address her overwhelming pain and to help her muscles relax.  A copy of Union Hospital's medical records (including imaging studies and reports) is attached hereto as Exhibit #11.

---

[22] See pictures of Ms. Garvine's abrasions and bruises attached hereto as Exhibit #10.

On October 16, 2015, Ms. Garvine presented to First State Orthopaedics with moderate-to-severe pain as a result of the right scapular body fracture she sustained five (5) days earlier. Ms. Garvine described her pain as constant, aching, and throbbing.  Ms. Garvine reported that her injury resulted in bruising, decreased mobility, difficulty sleeping, swelling, tenderness, and weakness.  Upon physical examination, P. Michelle Smith, PA-C observed chest wall tenderness on the right side.  She instructed Ms. Garvine as to range of motion exercises she could begin performing, ordered that she was limited weight bearing, and instructed her to return in three to four (3-4) weeks for a follow up appointment.  A copy of First State Orthopaedics' medical records are attached hereto as Exhibit #12.

On Monday, October 19, 2015, Ms. Garvine presented to her primary care doctor's office, New Castle Family Medicine (part of Christiana Care- New Castle Center), relating that she had sustained a right shoulder fracture and rib contusions.  Ms. Garvine presented with back pain, stiffness, muscle aches, and severe pain (intensity rating of 10 out of 10) to palpation in her right side ribs.  She expressed concern that she experienced more pain the day prior (October 18th) than she had in the days immediately following the accident.  Ms. Garvine related that she had been taking Percocet and Valium as needed.  After a physical evaluation, Brenda D. Nardozzi, FNP restricted Ms. Garvine from lifting, pulling, and pushing.  Ms. Garvine was directed to continue taking Percocet and Valium as needed for spasms and severe pain, and to take Ibuprofen when the pain was less severe.  She further instructed Ms. Garvine to apply a heating pad to her right side ribs.  A copy of New Castle Family Medicine's medical records is attached hereto as Exhibit #13.

Ms. Garvine returned to First State Orthopaedics on November 11, 2015 presenting with pain that she described as aching and fluctuating.  She explained that dressing herself was difficult and that it caused immense pain.  She had continued wearing her sling and had taken Percocet when the pain was intolerable.  An x-ray was taken of her (right) scapula and the images revealed that the scapula was in a stable position and showed evidence of early callus formation.  Upon conclusion of the examination, Eric T. Johnson, MD ordered that she continue with her range of motion exercises, gradually increase her activity level, wean from the sling (while at home), and return in four to six (4-6) weeks to additional obtain x-rays.

When Ms. Garvine returned to Dr. Johnson (of First State Orthopaedics) on December 9, 2015, she presented with ongoing, but intermittent, pain.  Despite continuing her home exercise programs, Ms. Garvine related that she was still experiencing soreness and stiffness.  Additional x-rays of the scapula were taken, revealing a stable position of the fracture, impingement appearance, and **osteoarthritic and osteophytic changes present involving acromion and a.c. joint.**  Dr. Johnson recommended that Ms. Garvine gradually increase her activity level but stated that if she continues to be significantly limited, an MRI may be necessary to rule out rotator cuff pathology.

**Lisa Garvine's Claim**

I evaluate this case as follows:

A. Special Damages

    1. Past Medical Bills[23]                  $4,826.37
    2. Future Medical Bills               Reserved
    3. Incidental Expenses[24]            $348.79

         **Total Special Damages:**      **$5,175.16**

B. Compensatory Damages

    1. Past Pain and Suffering

As Ms. Garvine prepared to begin the trail ride, she and her horse fell twelve (12) feet backwards over an embankment that she did not know existed (because it was not visible from the trail above). After crashing onto a bed of rocks at the conclusion of her fall, Ms. Garvine was pinned under her horse in two (2) feet of water. With the rocks digging into her back, and Ice's body weight crushing her (especially as he thrashed back and forth), Ms. Garvine was unable to breathe as a result of being underwater. Ms. Garvine lay trapped, fearing for her life. During one of Ice's attempts to rock back and forth to gain enough momentum to stand up, Ms. Garvine felt her shoulder be crushed under his body weight.

Ms. Garvine had to endure a bumpy ride on an ATV/gator-type vehicle back up through the field into the parking lot where she was provided with medical attention. Every bump caused searing pain through Ms. Garvine's back and shoulder. Upon arrival at the first aid tent, Ms. Garvine's arm and shoulder were in such extreme pain that her shirt needed to be cut off in order to examine her injuries. Ms. Garvine then had to suffer through an ambulance ride when her pain was so severe that the first intravenous pain killers provided no relief, and two doses of morphine were necessary.

---

[23] A copy of Ms. Garvine's medical bills summary sheet with bills is attached as Exhibit #14.
[24] Cost of replacement saddle and bridle in addition to USPS charges when Ms. Garvine mailed a cooling blanket that was lent to her after the accident back to the event host (see documentation attached hereto as Exhibit #15).

Ms. Garvine spent the next few weeks in immense pain, pain that she rated as "greater than 10" on a scale of 1-10. In addition to the constant, throbbing back/shoulder pain, Ms. Garvine experienced rib pain, limited mobility, and difficulty sleeping. Being right-handed, Ms. Garvine was severely restricted when it came to performing activities of daily living. An independent woman before the incident, Ms. Garvine required assistance with dressing herself, bathing, driving, and taking care of her pets (feeding and mucking the stalls) in the weeks following the terrifying fall.

Ms. Garvine still experiences ongoing, intermittent pain as a result of her shoulder injury. She is also sore and stiff, which continues to limit her mobility. Her most recent MRI showed osteoarthritic and osteophytic changes, which could explain why Ms. Garvine feels pain when the weather changes (most noticeable when it is cold or damp out). If Ms. Garvine's injuries do not improve with time, she will undergo another MRI in order to rule out rotator cuff pathology.

$75,000.00

### 2.   Future Pain and Suffering

It is anticipated that Ms. Garvine will experience future pain and suffering in the area where her clavicle was broken. It is reasonable to expect that she will experience arthritic changes as a result of the break as she continues to age, especially since osteoarthritic and osteophytic changes present involving acromion and a.c. joint have already been observed.

Reserved

### 3.   Emotional Distress

Ms. Garvine had been looking forward to the organized horseback ride because it allowed her to participate in her favorite activity (horseback riding, which she is passionate about) while helping benefit cancer research. Unfortunately, nothing on the morning of September 18, 2015 went as Ms. Garvine planned.

After making the drive from her home in New Jersey to Fair Hill, Maryland, Ms. Garvine fell backwards approximately twelve (12) feet before even beginning the trail ride. While Ms. Garvine was falling backwards blindly, she was equally concerned about hers and her horse's safety.

After the twelve (12) foot blind drop, Ms. Garvine lay trapped underneath her twelve hundred (1200) pound horse. Ms. Garvine tried to scream for help but quickly realized that she was submerged under water and that trying to scream caused her to swallow water. Ms. Garvine's horse appeared equally as terrified as he thrashed back and forth on top of his owner in an attempt to stand up. Ms. Garvine truly felt, while she was fully submerged underwater and was being repeatedly crushed by her (rolling) horse, that she was going to die.

Thankfully Ms. Garvine's horse was able to gain enough momentum by rocking back and forth to stand up, allowing Ms. Garvine to likewise stand. Ms. Garvine tried to regain her

composure and tried to have her breathing return to its normal rhythm.  Fortunately, Ms. Garvine did not die under her horse's weight, but she did suffer a very painful comminuted fracture of her scapula.

When Ms. Garvine observed the blood-red water and subsequently the blood spurting out of her horse's leg, she became frantic and alarmed.  Ms. Garvine was quickly carted from the scene of the fall to the first aid tent, leaving her horse behind.  Despite the immense pain Ms. Garvine was experiencing, her mind was on her horse whom she feared was seriously injured and likewise in excruciating pain.

As Ms. Garvine was being transported via ambulance to the hospital, she was concerned about her horse's health (it is common knowledge that injured horses are frequently put down), was concerned whether or not Ms. Boyer and other participants would be able to get Ice into a trailer (he has a fear of trailers), and about her fiancée whom she knew would be frantic after learning of the incident.

Even though Ice ended up sustaining non-life threatening injuries, Ms. Garvine was still concerned and upset about his injuries.

For a few months after the accident, Ms. Garvine was overcome with stress due to her inability to take care of herself, let alone run hers and her fiancée's business (White Horse Treasures) and care for her pets.

As a result of her serious injuries, and then subsequent winter weather, Ms. Garvine has not been able to get back on Ice (or any of her other horses) since the terrifying fall.  To her dismay, Ms. Garvine associates the terrifying backward plunge with horseback riding and fears that it (riding) will no longer provide her the peace and enjoyment that it used to when she is finally able to ride again.

$40,000.00

4.  Injury to Pet

Ms. Garvine's horse, Ice, pierced his hind right leg on a metal pole that was protruding from the side of the embankment[25], causing blood to squirt from his leg with every heartbeat.  Luckily, an individual at the scene's fast thinking to insert a finger into the puncture wound kept Ice from losing a fatal amount of blood.  The steep, unexpected fall, and then being stuck on his back in water were also undoubtedly frightening for Ice.

As a result of the incident, Ice also sustained significant injuries that required immediate medical attention.  A veterinarian that was on-scene at the event, had to inject Ice with sedatives in order to examine and bandage his right hind leg.  Upon arrival at home a few hours later, Ice was examined by his normal veterinarian, Dr. Robert Stephens, V.M.D. whom also had to sedate

---

[25] It is believed that the metal pole was part of an earlier fence that DNR allowed to deteriorate and did not replace.

Ice in order to takes x-rays of his leg.[26]   The physical examination and x-rays revealed that Ice had sustained a bone chip and lacerated artery.

$7,500.00[27]

|  |  |
|---|---|
| **Total Compensatory Damages:** | **$122,500.00** |
| **Total Damages:** | **$127,675.16** |

Accordingly, I conservatively value Ms. Garvine's claim at $127,675.16.

**Ms. Garvine is willing to settle her claim for the sum of $127,675.16.**  This offer is made without prejudice in an attempt to settle a disputed claim and will expire on June 30, 2016 at 4:30pm, unless previously withdrawn.

If this matter is not resolved prior to the expiration set above, we will enter suit on behalf of Ms. Garvine against the State of Maryland and seek a much higher award before a jury. Please let me know if you are interested in attempting to resolve this matter prior to the expiration date.

Please advise whether Oxford Feed & Lumber had taken out a liability insurance policy for the date of the event and whether you had been provided with a copy of said policy.  It is our understanding that Oxford Feed & Lumber was required to take out a $1,000,000.00 policy and add the State of Maryland as an additional insured.  If this is accurate, please provide our office with a copy of the indemnification agreement and insurance binder.

Thank you for your anticipated cooperation.  I look forward to working with you to resolve this tragic incident.

Very truly yours,

Charles L. Scott, Jr.

Enclosure (Demand with exhibits)
Cc:    Ms. Lisa E. Garvine

---

[26] Copies of Ice's veterinarian bills are attached hereto as Exhibit #16.
[27] See Courts & Judicial Proceedings § 11-110 of the Maryland Code.