IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| LISA E. GARVINE | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. JMC–17–01013 |
| STATE OF MARYLAND, *et al*, | * | |
| Defendants. | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

This suit arises out of injuries sustained by Plaintiff Lisa E. Garvine after falling off her horse on October 11, 2015, during a charity horse ride organized by Defendant The Oxford Grain & Hay Company ("Oxford") on land owned by Defendant State of Maryland ("Maryland" or the "State"), (collectively, the "Defendants"). The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4. (ECF Nos. 61, 63, 64). Plaintiff previously filed the Amended Complaint, (ECF No. 35), against Oxford and Maryland alleging negligence. Maryland has also filed a Third Party Complaint, (ECF No. 6), against Oxford for negligence and indemnification and/or contribution. Now pending before the Court is Oxford's Motion for Summary Judgment, (ECF No. 49), and Maryland's Motion for Summary Judgment, (ECF No. 50). In considering those motions, the Court has also reviewed all relevant responses in opposition and replies in support. (ECF Nos. 52, 53, 55, 56). No hearing is necessary. *See* Loc. R. 105.6 (D. Md. 2016). For the reasons that follow, both motions will be DENIED.

## I. FACTUAL BACKGROUND

### A. History and Organization of The Pink Poker Prance

The Oxford Grain & Hay Company is a Pennsylvania corporation that sells grain and feed, animal supplies, and lumber and hardware. (ECF No. 49–1 at 1). Oxford organizes the Pink Poker Prance, a yearly breast cancer awareness charity horse ride in the Fair Hill Natural Resources Management Area ("Fair Hill"). (Dep. of Lawrie Drennen, ECF No. 50–9 at 3). Oxford's Lawrie Drennen served as the event director. (ECF No. 49–4 at 1). Fair Hill is a property owned by the State and managed by the Maryland Park Service.[1] (Affidavit of Rachel Temby, Park Ranger, ECF No. 50–12 at ¶ 1). Fair Hill contains over five thousand (5,000) acres of land and approximately eighty (80) miles of trails. (Dep. of Rachel Temby, ECF No. 50–8 at 3).

On September 25, 2015, Oxford submitted an Organizational Plan to the State for the Pink Poker Prance event that the State accepted. (ECF No. 49–4 at 1). The Organizational Plan stated that the "Event Director," i.e. Ms. Drennen, "has overall responsibility for the safe conduct of the event" and "shall coordinate with the park authorities prior to the ride to ensure that [the] trail is in good shape and course conditions are suitable for safe conduct of the event." *Id.* As part of the Organizational Plan approval, Oxford secured one million dollars ($1,000,000.00) in insurance and agreed to pay the State a one hundred twenty-five dollar ($125.00) reservation fee. (ECF Nos. 52–11, 52–12).

### B. Plaintiff's Injury at the 2015 Pink Poker Prance

---

[1] Maryland regulations define a natural resources management area as an "undeveloped, agrarian landscape of woodlands, fields and agriculture" that is "managed for the primary benefit of wildlife habitat, sustainable farming and passive, nature-based recreation, such as hunting, fishing, wildlife observation and boat access." Md. Code Regs. 8.07.06.02.

On October 11, 2015, the date of the event, Oxford provided Pink Poker Prance participants with event instructions when they entered the Fair Hill parking lot. (ECF No. 50–9 at 10–11). Participants were instructed to: (1) stop at the registration tent upon arrival to pick up their first poker card and a goodie bucket; (2) proceed to the photo opportunity area; and then, (3) proceed to the starting gate, where they would receive their second poker card. (ECF No. 50–11; Dep. of Lisa Garvine, ECF No. 50–4 at 24–27). The station for receiving the second poker card was between fifty (50) and seventy (70) feet from the beginning of the Orange Trail. (ECF No. 50–9 at 15). All of the approximately three hundred fifty (350) participants were also required to sign a waiver and release before heading out on the trail. *Id.* at 8–9, 18.

Lisa Garvine arrived at the event with her fiancé's adult daughter, LeeAnn Haaf, and her two horses, Ice and Reiner. (ECF 50-4 at 21; 98–99). Before the event began, they were joined by Ms. Garvine's best friend, Sandy Boyer, as well as Ms. Garvine's cousin, Rodney Klair, and his girlfriend. (ECF No. 49–1 at 6). Ms. Garvine did not pay any entrance fee to use the Fair Hill premises on that date, but she did pay a thirty-five dollar ($35.00) fee to Oxford for participation in the event. (ECF No. 53–2 at 7). Ms. Garvine also bought tickets for raffle items, (ECF No. 50–4 at 81–82), and signed the registration form, (ECF No. 50–13). The registration form included a waiver:

> Oxford Feed & Lumber is not responsible for any person, horse or your property during the trail ride. Please secure your belongings and trailer. Participate at your own risk. **Rider cannot participate unless this form is filled out completely and SIGNED.**

ECF No. 50–13 at 2 (emphasis in original). Ms. Garvine testified that she read the waiver to mean that "Oxford Feed is not responsible for [Ms. Garvine] or [her] horse if anything happens to [her] or [her horse] out on that charity ride." (ECF No. 56 at 4). Although she had been to

Fair Hill before, Ms. Garvine testified that she had not been through the area where the accident occurred, although she admitted that it is possible she had been through there on a different charity ride. (ECF No. 50–4 at 100). She did not do anything in particular to prepare her horse, Ice, for the event. *Id.* at 59–60.

As it does every year, Oxford selected the "Orange Trail" at Fair Hill as the trail route for the Pink Poker Prance. (ECF No. 50–9 at 4–5). The Orange Trail begins at a gravel trail road and is marked with an orange trail blaze marker. (ECF Nos. 50–8 at 19–20; 50–9 at 17; 50–15). The trail was marked with pink ribbons on the day of the event. (ECF No. 52–10 at 1–2). There are approximately three (3) to five (5) wide grass strips along either side of the trail that are to be mowed weekly. (ECF No. 50–8 at 22). At the start of the Orange Trail on the east side, there is a culvert[2] situated off of the first orange blaze marking on the trail. (ECF Nos. 50–4 at 87; 50–8 at 19; 50–15). The culvert is located next to a stream and is positioned lower than the trail itself, so there is a moderately steep drop off from the edge of the trail. (ECF Nos. 50–8 at 10; 50–4 at 96–97). There is only one break in the fence such that it is the only way to get from the registration field onto the Orange Trail. (ECF No. 50–9 at 14). A Park Hill ranger testified that this route was used in other equestrian events and did not create a dangerous situation for horses or riders. (Dep. of Joann Bashore, ECF No. 49–7 at 3–5).

After first stopping at the registration tent to check in and purchase raffle tickets, Ms. Garvine mounted Ice at her trailer and proceeded directly to the start of the course with Ms. Boyer, with Ms. Haaf trailing behind them. (Dep. of LeeAnn Haaf, ECF No. 50–5 at 15; Dep. of Lisa Garvine, ECF No. 50–4 at 24). They did not stop at the event photo booth or second card station, heading straight to the road from the trailer. (Dep. of Lisa Garvine, ECF No. 50–4 at 26–

---

[2] A culvert is a structure that allows water to flow under a road or a trail.

27). Upon reaching the start of the Orange Trail from the registration field, Ms. Boyer and Ms. Garvine observed a group of about five (5) horse-and-rider pairs stopped ahead of them on the trail. (Dep. of Lisa Garvine, ECF 50–4 at 30; Dep. of Sandra Boyer, ECF No. 50–14 at 5). A member of that group ahead yelled for Ms. Boyer and Ms. Garvine to stop because one of the horses ahead was bucking its rider. (ECF No. 50–4 at 32). Ms. Boyer stopped her horse so that she continued to face the direction of the trail and the front group of horses. (ECF No. 50–14 at 6-7). Ms. Garvine rode up next to Ms. Boyer and turned Ice to face her, away from the direction of the trail and other horses, so that the two women could speak while they waited. (ECF No. 50–4 at 32, 35, 86). Ms. Garvine testified that they "weren't very far" from the front group of horses. (ECF No. 50–4 at 41). Ms. Boyer testified they were "very close." (ECF No. 50–14 at 12). Although Ms. Garvine could not recall exactly where her horse was positioned relative to Ms. Boyer or the edge of the culvert, (ECF No. 50–4 at 93), Ms. Boyer recalled that their horses were about two (2) horse lengths apart. (ECF No. 50–14 at 11).

Ms. Garvine and Ms. Boyer talked for a few minutes while they waited for the front group to calm the bucking horse. (ECF No. 50–4 at 35–36). When the front group "was getting ready to move on," Ms. Garvine directed Ice to turn to the right in order to proceed onto the trail ride because the area to the left was "overgrown." *Id.* at 32, 44. According to Ms. Garvine, at that point, Ice "squared" up to turn, took a step, and fell down the edge of the culvert. *Id.* at 44–45. Ms. Garvine asserts she did not direct Ice to move backward at any point. *Id.* at 47. After Ice lost his footing down the edge of the culvert, Ms. Garvine fell into a stream and Ice landed on top of her. *Id.* at 48. Ice had to roll five (5) or six (6) times in order to get up. *Id.* Ms. Garvine suffered bruises and abrasions as well as injuries to her shoulder, scapula, and ribs. *Id.* at 78, 91, 95. Ice made a full recovery. *Id.* at 92.

Ms. Garvine testified that the edge of the culvert, the drop off, and the stream were obscured by high weeds and overgrown vegetation so that she could not see the drop off or stream as she sat on her horse. *Id.* at 34, 71. She described the overgrowth as being the height of a conference table or a little lower, and explained that the vegetation was located off of the trail, in the grass strip between the road and the culvert edge. *Id.* at 87, 95, 98. Ms. Boyer testified that there was "a lot" of grass off to the right of the trail, estimating that the grass between the trail road and the edge of the culvert was approximately eighteen (18) inches high. (ECF No. 50–14 at 16). She agreed that she would have been able to see the culvert over the grass while seated on her horse, but stated that she was not looking in that direction at the time. *Id.* at 17–18. Ms. Haaf also stated that there was "all this vegetation" in the area in front of where Ms. Boyer and Ms. Garvine had stopped their horses, and that she saw Ms. Garvine and Ice "disappear[] into vegetation." (ECF No. 52–14 at 3–4). Mr. Drennen testified that the growth around the culvert that day was between three (3) and four (4) feet tall. (ECF No. 52–9 at 12). Ms. Temby testified that the culvert was not obscured by vegetation and explained that visitors to Fair Hill are to utilize the trails in the designated areas only. (ECF No. 50–8 at 21, 24–26).

Prior to and in anticipation of the 2015 Pink Poker Prance, Fair Hill's trail crew checked course maps and the corresponding trails for downed trees, low limbs, loose rocks, and other similar conditions. (ECF No. 50–8 at 8–10). Although the trail crew members look for "blatant issues," they "don't do an overhaul of the trail as far as sweeping it free of leaves and debris and twigs" because it is a "natural setting." *Id.* According to Ms. Temby, Plaintiff was the first person to fail to observe the culvert and fall into it in the six (6) years that the Pink Poker Prance event has been held. (ECF No. 50–8 at 14). Mr. Drennen was also unaware of any injuries from the previous years' Pink Poker Prance events. (ECF No. 50–9 at 5).

### C. Plaintiff's Prior Experiences with Ice and Statements Made After Injury

Ms. Garvine began riding at the age of eight (8) and acquired her first pony at thirteen (13). (ECF No. 50–4 at 3). At the time of the accident, Ms. Garvine was 56 years old. (ECF No. 52–3 at 2). She testified that she understand horse riding can be a dangerous activity and going out onto somebody else's land can also be dangerous. (ECF No. 50–4 at 66). Ms. Garvine acquired Ice in 2006. *Id.* at 5. She described him as a "trail horse," and a gelding "Quarter Horse" that is fifteen and one-tenth (15.1) hands tall. *Id.* at 11–12. She does not know if Ice has done trail events in the past. *Id.*

Ms. Haaf testified that Ice can be difficult to load into a trailer and can be "stubborn," so she was "working with him and retraining him to load" in the time after the accident leading up to her deposition. (ECF No. 50–5 at 5). However, on the date of the Pink Poker Prance, Ice did not have any problems being loaded into the trailer. (ECF No. 50–4 at 20). Ms. Garvine's cousin, Rodney Klair, testified that he did not like Ice because he is a "stubborn" horse and will become "fussy" when separated from other horses. (ECF No. 50-7 at 6–9). Mr. Klair further explained that he has witnessed Ms. Garvine have to dismount Ice, at least two times, when he became agitated from separation anxiety from other horses. *Id.* at 10. Ms. Garvine also testified that Ice had previously backed up "on his own" without instruction to do so, and that she has fallen from Ice twice. (ECF No. 49–9 at 8–10). At least one time, Ms. Garvine fell because Ice had wanted to "run the fence line" with other horses and "bucked." *Id.* Ice has also "thrown" her. *Id.* at 7. Ms. Garvine has not taken any riding lessons on Ice, but "tr[ies] to go out three to four times a month maybe" to ride Ice. (ECF No. 50–4 at 14, 16).

After the incident, as Ms. Garvine awaited medical treatment, Mr. Klair approached and asked her, "Now can we get rid of that fucking horse?" (ECF No. 50–7 at 6). His statement was

also overheard by a Fair Hill park ranger. (Dep. of Michael Harkins, ECF No. 50–20 at 5). In response, Ms. Garvine allegedly stated: "Yes, I guess we can get rid of the horse now. This is about the third time he's—second or third time that he sat there and threw me." (Dep. of Darlene Clark-Reedy, ECF No. 50–19 at 3).[3] Ms. Garvine also allegedly stated that Ice was too "green" to come to the event, that she should not have brought him to it, and that the fall had been her fault. *Id.* at 8–10. Further, Ms. Garvine allegedly explained that when she asked Ice "to go, he got scared, didn't want to go, and backed up into the culvert." *Id.* at 11. Ms. Garvine denies making any of these statements. (ECF No. 52–3 at 34–35).

## II.  LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) requires the Court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden "to demonstrate the absence of any genuine dispute of material fact." *Jones v. Hoffberger Moving Servs. LLC*, 92 F.Supp.3d 405, 409 (D. Md. 2015) (internal citations omitted). A dispute as to a material fact "is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *J.E. Dunn Const. Co. v. S.R.P. Dev. Ltd. P'ship*, 115 F.Supp.35 593, 600 (D. Md. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

A nonmoving party "opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003). The court is "required to view the facts

---

[3] Darlene Clark-Reedy was another participant in the Pink Poker Prance who examined Ms. Garvine's injuries after the accident. She is a retired firefighter/paramedic and currently works as a hospice nurse. (ECF No. 50–18). She filed an affidavit stating that she heard this exchange between Mr. Klair and Ms. Garvine. *Id.*

and draw reasonable inferences in the light most favorable to" the nonmoving party, *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008) (citing *Scott v. Harris*, 550 U.S. 372, 377 (2007)), but must also "abide by the 'affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial.'" *Heckman v. Ryder Truck Rental, Inc.*, 962 F.Supp.2d 792, 799–800 (D. Md. 2013) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778–79 (4th Cir. 1993)).

## III. DISCUSSION

In their Motions for Summary Judgment, Oxford and the State of Maryland argue that Plaintiff cannot establish certain elements of negligence against them, including breach of an applicable duty and causation. Both Defendants also argue that Plaintiff was contributorily negligent, assumed the risk of injury, and signed a valid waiver of liability. Maryland further asserts that Plaintiff's claims are barred by the Maryland Recreational Use Statute. For its part, Plaintiff responds by arguing that Oxford and the State were negligent because she was an invitee and Defendants failed to exercise ordinary care to inspect the property and warn of the presence of the culvert and stream located just off the trail.

### A. Negligence

To recover for negligence, the Maryland Court of Appeals requires that a plaintiff bears the burden of proving "the existence of four elements: a duty owed to him, a breach of that duty, a causal connection between the breach and the injury, and damages." *Southland Corp. v. Griffith*, 332 Md. 704, 712 (1993).

### i. Duty and Breach

The level of duty owed to Plaintiff depends on whether she had the status of an invitee, a bare licensee, or a trespasser. *Appiah v. Hall*, 416 Md. 533, 560 (2010). Invitees may be

business or public: a business invitee is "invited or permitted to enter or remain on another's property for purposes connected with or related to the owner's business," *id.*, while a public invitee is "invited to enter or remain on land as a member of the public for a purpose for which the land is held open to the public," *Deering Woods Condo. Ass'n v. Spoon*, 377 Md. 250, 262 (2003). The duty owed to invitees is to "use reasonable and ordinary care to keep [the] premises safe" and "to protect [them] from injury caused by an unreasonable risk which the invitee, by exercising ordinary care for his own safety will not discover." *Appiah*, 416 Md. at 561 (quoting *Rowley v. Mayor & City Council of Baltimore*, 305 Md. 456, 465 (1986)). A bare licensee is "one who enters upon property, not as a social guest, but for his or her own convenience or purpose and with the landowner's consent," and is owed no duty except that "he or she may not be wantonly or willfully injured or entrapped, nor may the occupier of land 'create new and undisclosed sources of danger without warning the licensee.'" *Wagner v. Doehring*, 315 Md. 97, 102 (1989). Similarly, a trespasser is "one who intentionally and without consent or privilege enters another's property" and is owed no duty except to refrain from willfully or wantonly injuring or entrapping. *Id.*

An individual may be an invitee with respect to one portion of the premises and a bare licensee or trespasser with respect to another portion. *Levine v. Miller*, 218 Md. 74, 79 (1958). The change in status may depend on "chronological" or "geographical" facts, such as expiration of the business purpose or entrance onto a portion of the premises not included as part of the business invitation. *Id.*

In its Motion, Oxford argues that Plaintiff was a trespasser at the time of the incident because she had, at that point, entered the culvert, which was located off of the Orange Trail.[4] In

---

[4] Defendant Oxford argues initially that because it was not the landowner, it owed no duty to event participants. This is belied by the Organizational Plan it submitted to the State for the Pink Poker Prance event that the State

support of its argument, Oxford cites to the park ranger's testimony that visitors to Fair Hill were only invited to utilize the trails, specifically the Orange Trail for the Pink Poker Prance. (ECF No. 50–8 at 21, 26). Oxford further argues that there is no evidence that Plaintiff was invited to travel with her horse off of the Orange Trail and into the culvert. Plaintiff concedes that the accident occurred off of the designated trail road; however, she argues that she did not intend to go off the trail, and that trespass is an intentional act. Plaintiff alleges that there is a reasonable distance from the trail that horses should be expected to traverse at any point during the ride, arguing that "[b]y virtue of her horse stepping less than four (4) feet off of the access road, which was the designated start of the trail ride . . . [her] status does not automatically revert from invitee to licensee." (ECF No. 52–2 at 20). She further points out that she did not "intentionally venture into the woods on an exploration of her own," and therefore cannot be considered a either a trespasser or a licensee. *Id.*

Based on the arguments of counsel, the Court cannot say as a matter of law that Plaintiff was trespassing or a bare licensee.[5] As Plaintiff has argued, a horseback riding trail in a public park under the circumstances of this case does not have such a clear demarcation between "on trail" and "off trail" for large animals attempting to right themselves and stepping onto the "shoulder" of the trail that the Court can dispose of the matter on summary judgment. Although a full exploration of areas in the woods and off of the trails would turn an entrant into a licensee

---

accepted. (ECF No. 49–4 at 1). The Organizational Plan stated that the "Event Director," i.e. Ms. Drennen, "has overall responsibility for the safe conduct of the event" and "shall coordinate with the park authorities prior to the ride to ensure that [the] trail is in good shape and course conditions are suitable for safe conduct of the event." *Id.* Thus, although Oxford is not the landowner, it could still be subject to liability in this case based upon those undertakings. Moreover, premises liability principles would still apply to Oxford as a "possessor" of the land at the time. *Rowley*, 305 Md. at 464.

[5] Maryland case law also does not provide a clear answer. *See, e.g.*, *Casper v. Charles F. Smith & Son, Inc.*, 316 Md. 573, 579 (1989) (finding that ordinary users of portions of designated parks to which entry is not prohibited have the status of an invitee, but not reaching the question of entrant status on "raw" park land intentionally held in its natural state).

(or perhaps even a trespasser), under these circumstances, it is not clear that stepping a few feet off of the trail in the process of turning one's horse yields the same result.

There are also facts from which a jury could conclude that Plaintiff was a public invitee when participating in the Pink Poker Prance on the Orange Trail. She was invited onto the land for the charity ride (not to conduct any business with the State) and she was specifically invited to use certain areas of the land, including the parking lots, the registration field area, and the Orange Trail. Whether she remained a public invitee or assumed the status of bare licensee/trespasser when she and her horse stepped down into the culvert is a matter for jury determination. Moreover, the Court cannot conclude as a matter of law that the "shoulder" area of the horse trail was not an area where a horse could reasonably be expected to go consistent with the invitation to participate in the event at the park.

At the Pink Poker Prance, there was only one access point from the grass parking lot area by which to enter the Orange Trail, and every horse and rider pair must funnel through that access point to begin the trail ride, making it foreseeable (if not likely) that multiple horses would be on the trail in the same area at the same time. (ECF No. 50–9 at 14). The horses necessarily need to accommodate each other, and the control and precision with which the riders are reasonably able to maintain their horses is another factor in the logistics of the trail ride. These are some of the facts from which a jury must determine whether a horse varying from the trail by four (4) feet changes the status of its rider from an invitee to licensee or trespasser.

After determining whether Plaintiff was an invitee or a licensee/trespasser at the time of her fall, the jury must also decide whether or not the standard of care owed to her was breached. Again, the duty owed to invitees is to "use reasonable and ordinary care to keep [the] premises safe" and "to protect [them] from injury caused by an unreasonable risk which the invitee, by

exercising ordinary care for his own safety will not discover." *Appiah*, 416 Md. at 561 (quoting *Rowley*, 305 Md. at 465). If the jury determines that Plaintiff was an invitee at the time of her fall, the jury must then also decide whether the duty owed to her was breached, which boils down to a factual inquiry regarding the overgrowth blocking view of the culvert and what need, if any, there was to place a warning or take some other action. There are disputes of material fact as to how tall the grass in front of the culvert was on the day of the event, whether vegetation obscured the culvert, whether the area had been mowed, and whether the culvert was open and obvious.[6]

### ii. Causation

Defendants argue that Plaintiff's injuries were neither caused by any alleged breach of duty nor foreseeable. The State of Maryland argues that the causation element is not met because regardless of whether or not the State had placed a warning sign or cone by the culvert, Ms. Garvine's horse did not obey commands and took unexpected steps back into the culvert without being prompted to do so. For its part, Oxford argues that Plaintiff's injury was not foreseeable because no participant had ever been injured in the culvert at the Pink Poker Prance in prior years and Oxford had no expectation that participants would travel off of the trail in the manner that Ms. Garvine and Ice did.

The Maryland Court of Appeals has recognized the "basic principle that negligence is not actionable unless it is a proximate cause of the harm alleged." *Pittway Corp. v. Collins*, 409 Md. 218, 243 (2009). For a defendant's negligence to be a proximate cause of the plaintiff's injury, "the negligence must be 1) a cause in fact, and 2) a legally cognizable cause." *Id.* (citing

---

[6] Plaintiff also argues that, "[e]ven if she were a mere licensee, the hidden drop-off—akin to a tank trap or tiger trap—was a trap set for the unsuspecting park guest." However, as described above, disputes of material fact exist as to the condition of the culvert and surrounding grass and vegetation. Accordingly, the questions of whether Ms. Garvine was an invitee or licensee at the time of her accident and whether Defendants breached the corresponding duty to Ms. Garvine remain for the jury to consider.

*Hartford Ins. Co. v. Manor Inn*, 335 Md. 135, 156–57 (1994)). Causation-in-fact concerns the threshold inquiry of "whether defendant's conduct actually produced an injury." *Id.* at 244 (quoting *Peterson v. Underwood*, 258 Md. 9, 16–17 (1970)). After a plaintiff has established causation-in-fact, "the proximate cause inquiry turns to whether the defendant's negligent actions constitute a legally cognizable cause of the complainant's injuries." *Id.* at 245. Here, courts consider "whether the actual harm to a litigant falls within a general field of danger that the actor should have anticipated or expected." *Id.* (citing *Stone v. Chicago Title Ins. Co. of Maryland*, 330 Md. 329, 337 (1993)). The question of proximate cause "involves a determination of whether the injuries were a foreseeable result of the negligent conduct," as legal causation "is a policy-oriented doctrine designed to be a method for limiting liability after cause-in-fact has been established." *Id.* at 245–46.

Defendants are not entitled to summary judgment on the basis of causation. A reasonable jury could find that Plaintiff would have positioned herself and her horse differently and avoided injury had Defendants posted warning signs or cones near the culvert. A reasonable jury could also find that the injury would have occurred regardless of the warning sign/cone because Ice did not obey Ms. Garvine's commands. Ultimately, these factual questions are not properly for the Court to determine at this stage.

### B. Contributory Negligence

In Maryland, contributory negligence acts as a bar to recovery in negligence actions by at-fault plaintiffs. *Coleman v. Soccer Ass'n of Columbia*, 432 Md. 679, 697–98 (2013) (examining the history of the contributory negligence doctrine as a "mainstay of Maryland law"). "Contributory negligence as a matter of law requires a finding that the negligent act of the plaintiff . . . relied upon must be prominent, decisive and one about which ordinary minds would

not differ in declaring it to be negligence." *McSlarrow v. Walker*, 56 Md. App. 151, 161 (1983) (citations omitted). In analyzing contributory negligence, courts must consider "the conduct of an ordinarily prudent person under similar circumstances," while also recognizing that "even if the act done turns out to be an error of judgment, this alone does not make the act negligent if an ordinarily prudent person may have made the same error." *Id.*

Neither defendant is entitled to summary judgment on the basis of contributory negligence. There is a dispute of fact regarding Ice's prior disobedient behavior and whether Ms. Garvine was contributorily negligent by bringing him on a trail ride. Although Ice had been known to be stubborn or anxious in the past, it is unclear whether he exhibited those behaviors on the day of and, specifically, at the time of the incident. Additionally, there is a factual dispute as to whether Ms. Garvine was contributorily negligent by directing her horse in a particular way, leading to her injury. The question of contributory negligence is for the jury to decide.

### C. Assumption of Risk

In order to establish the defense of assumption of risk, "the defendant must show that the plaintiff: (1) had knowledge of the risk of the danger; (2) appreciated that risk; and (3) voluntarily confronted the risk of danger." *S & S Oil, Inc. v. Jackson*, 428 Md. 621, 643 (2012) (quoting *ADM Partnership v. Martin,* 348 Md. 84, 90–91 (1997)). The test for assumption of the risk, or "whether the plaintiff knows of, and appreciates, the risk involved in a particular situation," is an objective one and "ordinarily is a question to be resolved by the jury." *Schroyer v. McNeal*, 323 Md. 275, 283 (1991) (citing *Gibson v. Beaver*, 245 Md. 418, 421 (1967)). Only "when it is clear that a person of normal intelligence in the position of the plaintiff must have understood the danger [is] the issu[e of assumption of the risk] for the court" to decide. *Id.*

Defendants argue that Plaintiff knew that riding horses is a dangerous activity and that entering on someone else's land could also be dangerous. Although Ms. Garvine recognized at her deposition that she, as Ice's rider, had "the ultimate responsibility to be alert to anything in [her] surroundings that might impact [her] or [her] horse," (ECF No. 50–4 at 68), it is not clear that she actually assumed the risk of her specific injuries in this instance (i.e., falling into a culvert allegedly covered by overgrown vegetation). Ms. Garvine stated that she had no knowledge that the culvert existed and that she did not see it prior to her fall. (ECF No. 50–4 at 34, 71). In response to Defendant's Motions, she argues that she could not have voluntarily assumed the risk of falling into a culvert of which she had no knowledge. *See Kasten Const. Co. v. Evans*, 260 Md. 536, 544 (1971) (holding that "the doctrine of assumption of risk will not be applied unless the undisputed evidence and all permissible inferences therefrom clearly establish that the risk of danger was fully known to and understood by the plaintiff"), *Rogers v. Frush*, 257 Md. 233, 243 (1970) (explaining that the danger to which the plaintiff is exposed must be "known"). Therefore, the question of whether Ms. Garvine assumed the risk of her injury remains one for the jury.

### D. Validity of Waiver

In Maryland, it is well settled and "consistent with the public policy of freedom of contract[ ] that exculpatory contractual clauses generally are valid." *Adloo v. H.T. Brown Real Estate, Inc.*, 344 Md. 254, 259 (1996). Prior to addressing the inquiry of whether the exculpatory phrase in a waiver is valid, the threshold issue of whether the clause at issue is, in fact, an exculpatory one must be addressed first. *Id.* at 261. This first question of "the adequacy of the clause to shield one of the parties from liability" turns on "the intention of the parties," which requires construing the language of the subject clause. *Id.* at 261–62 (noting the general rule that

"contracts will not be construed to indemnify a person against his own negligence unless an intention to do so is expressed in those very words or in other unequivocal terms."). An exculpatory clause must be "unambiguous but also understandable." *Id.* at 264. In order to immunize a defendant from negligence liability, the clause must "clearly and specifically indicate[] the intent to release the defendant from liability for personal injury caused by the defendant's negligence," although "the exculpatory clause need not contain or use the word 'negligence' or any other 'magic words.'" *Id.* at 266. The clause must define the scope of liability from which the parties "clearly, unequivocally, specifically, and unmistakably express [their] intention to exculpate the [defendant]." *Id.* at 267.

In this case, the waiver in question was included at the bottom of the registration form signed by Pink Poker Prance participants and read:

> Oxford Feed & Lumber is not responsible for any person, horse or your property during the trail ride. Please secure your belongings and trailer. Participate at your own risk. **Rider cannot participate unless this form is filled out completely and SIGNED.**

(ECF No. 50–13) (emphasis in original). The only specific situations contemplated by the waiver are those regarding participants' personal belongings and horse trailers. The clause reads similarly to the waiver the Supreme Court of New Hampshire considered in *Audley v. Melton*, 138 N.H. 416 (1994). *Adloo*, 344 Md. at 264–65. There, a model signed a waiver prior to participating in a photography shoot with a lion. The release read:

> I *Shannon Audley* realize that working with the *[sic]* wild and potentially dangerous animals (i.e. lion, white tiger, hawk) can create a hazardous *[sic]* situation, resulting in loss of life or limb. I take all responsibility upon myself for any event as described above that may take place. I hold Bill Melton and T.I.G.E.R.S. or any of their agents free of any or all liability. I am signing this of my on *[sic]* free will.

*Audley*, 138 N.H. at 417.  The New Hampshire court ultimately held:

> The release recognizes certain risks inherent in working with wild animals, and then promises to hold the defendant "free of any and all liability."  Although this release insulates the defendant from liability for injuries inflicted by wild animals when no negligence on the part of the defendant is involved, it does not effectively release the defendant from liability based on his own negligence. Quite simply, the general release language does not satisfy the requirement that "the contract must clearly state that the defendant is not responsibility for the consequences of his negligence."  The release fails in this respect not because it fails to use the word "negligence" or any other terms; instead it fails because no particular attention is called to the notion of releasing the defendant from liability for his own negligence.  The general language in the context of the release simply did not put the plaintiff on clear notice of such intent.

*Adloo*, 344 Md. at 265 (citing with approval the New Hampshire Supreme Court's holding in *Audley*).

Similarly, the clause that Ms. Garvine signed here fails to "clearly, unequivocally, specifically, and unmistakably" communicate the intent of participants in the trail ride to release Oxford from liability for falls caused by negligent conditions on the trail or immediately adjacent to the trail including tall grass and a below-the-grade culvert allegedly obscured by that grass. Although the waiver clause may contemplate injury suffered at the hands of another event participant or horse and damage to personal property, such as horse trailers, the clause does not clearly exonerate Oxford of liability for injury suffered as a result of an unreasonable failure to maintain the premises of the Orange Trail.  A reasonable person could certainly find that the waiver does not unambiguously reach the type of negligence on the part of Oxford that Ms. Garvine alleges, and I therefore decline to grant summary judgment on the basis of the waiver.

### E. Maryland Recreational Use Statute

The State of Maryland argues that it is immune from Plaintiff's claim because it did not owe her a duty of care under Maryland's Recreational Use Statute ("MRUS"). Md. Code Ann. Nat. Res., § 5–1101 *et seq.* (2012 Repl. Vol., 2017 Supp.).[7] Under the MRUS:

> [A]n owner of land owes no duty of care to keep the premises safe for entry or use by others for any recreational or educational purpose, or to give any warning of a dangerous condition, use, structure, or activity on the premises to any person who enters on the land for these purposes.

*Id.* § 5–1103. Moreover, the statute makes clear that a landowner who opens his or her land for recreational purposes does not assure that the premises are safe and does not confer upon the entrant the legal status of invitee or licensee. *Id.* § 5–1104. There are two exceptions to MRUS immunity: (1) when the landowner engages in willful or malicious conduct; and (2) when the landowner charges money for the recreational use of the land. *Id.* § 5–1106.

The parties do not appear to dispute that Maryland is an "owner" of Fair Hill within the meaning of the statute and that Ms. Garvine was on the land for recreational purposes on the date of her injury. They also appear to agree that Ms. Garvine was not charged a fee to actually enter Fair Hill on that date, although she did pay thirty-five dollars ($35.00) to participate in the event. Maryland charged Oxford a one hundred twenty-five dollar ($125.00) event registration fee to set up the Pink Poker Prance at Fair Hill.

The inquiry here is whether either the event registration fee levied on Oxford or the participation fee levied on Ms. Garvine constituted a "charge" under the statute that would defeat Maryland's immunity. "Charge" is defined under the statute:

---

[7] The purpose of the MRUS is to "encourage any owner of land to make land . . . areas available to the public for any recreational and educational purpose by limiting the owner's liability toward any person who enters on land . . . areas for these purposes." Md. Code Ann., Nat. Res., § 5–1102.

> (1) "Charge" means price or fee asked for services, entertainment, recreation performed, or products offered for sale on land or in return for invitation or permission to enter or go upon land.
> (2) "Charge" does not include:
>> (i) The sharing of game, fish, or other products of recreational use;
>> (ii) Benefits to the land arising from the recreational use; or
>> (iii) Contributions in kind or services to promote the management or conservation of resources on the land.

Md. Code Ann., Nat. Res., § 5–1101(b). Maryland contends that Oxford's event registration fee is not a "charge" as defined in the statute, but instead serves as a flat reservation fee that Fair Hill requires of the event organizer regardless of the number of participants anticipated. In essence, Maryland argues that it is not a per-person fee levied on the participants, but a single nominal fee levied on the event organizer for reservation purposes. Plaintiff argues that the fee was "passed on" to participants through the participation fee that each person, including Ms. Garvine, was required to pay to Oxford to take part in the Pink Poker Prance.

The statute itself does not distinguish between flat fees and per-person fees, and there is no Maryland case law suggesting that such a distinction matters. The statutory definition of "charge" appears to be broad, and includes the "price or fee asked . . . in return for invitation or permission to enter or go upon land." *Id.* The definition appears to cover the event reservation fee paid by Oxford here. Without Oxford's payment of the one hundred twenty-five dollars ($125.00), the participants could not have attended the Pink Poker Prance at Fair Hill that day.

Although Ms. Garvine testified that she was not personally charged a fee to enter the Fair Hill grounds on that day, it would defeat the purpose of the statute if a landowner could charge a third party to host an event and then claim immunity as to all of the participants of that event because they did not pay a fee directly to the landowner. Moreover, the exceptions to the definition of "charge" do not contemplate the type of distinction that Maryland attempts to make.

Accordingly, I decline to grant summary judgment in favor of the State of Maryland on the basis of immunity under the MRUS.

## IV.    CONCLUSION

For the foregoing reasons, Defendant The Oxford Grain & Hay Company's Motion for Summary Judgment, (ECF No. 49), is DENIED and Defendant State of Maryland's Motion for Summary Judgment, (ECF No. 50), is also DENIED.   Plaintiff is instructed to arrange a telephone conference with counsel for all parties and the Court to discuss further proceedings, including the setting of a trial date.


Dated: September 4, 2018                         _____/s/_____

                                                                    J. Mark Coulson
                                                                    United States Magistrate Judge